IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JESSICA C. RUSSELL, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 1:13-CV-291 |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KENNETH S. McHARGH |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | **MEMORANDUM OPINION &** |
| | ) | **ORDER** |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties. (Doc. 15). The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Jessica Russell's applications for Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*., and for a Period of Disability and Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Court AFFIRMS the Commissioner's decision.

## I. PROCEDURAL HISTORY & PERSONAL BACKGROUND

Plaintiff Jessica Russell ("Plaintiff" or "Russell") filed applications for Supplemental Security Income benefits and Disability Insurance benefits on October 9, 2009. (Tr. 19, 151-60). Russell alleged she became disabled on January 1, 1995 due to suffering from a learning disability. (Tr. 181). The Social Security Administration denied Plaintiff's applications on initial review and upon reconsideration. (Tr. 89-94, 98-103).

1

At Russell's request, administrative law judge ("ALJ") Frederick Andreas convened an administrative hearing on June 7, 2011 to evaluate her applications. (Tr. 34-84).  Plaintiff, represented by counsel, appeared and testified before the ALJ. (*Id*). A vocational expert ("VE"), Deborah Lee, also appeared and testified. (*Id.*).  On September 19, 2011, the ALJ issued an unfavorable decision, finding Plaintiff was not disabled. (Tr. 19-29)  After applying the five-step sequential analysis,[1] the ALJ determined Russell retained the ability to perform work existing in significant numbers in the national economy. (*Id*.).  Subsequently, Plaintiff requested review of the ALJ's decision from the Appeals Council. (Tr. 14-15)  The Appeals Council denied the request for review, making the ALJ's September 19, 2011 determination the final decision of the

---

[1] The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability." *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows:

(1)     If a claimant is doing substantial gainful activity–i.e., working for profit–she is not disabled.

(2)     If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

(3)     If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

(4)     If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

(5)     Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

Commissioner. (Tr. 1-5).  Plaintiff now seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

Russell was born on August 5, 1988, making her six years old on the date of her application and twenty-three years old on the date the ALJ rendered his decision. (Tr. 167). Accordingly, at all relevant times, she was considered as a "younger person" for Social Security purposes. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).  Plaintiff attended school up until the eighth grade, and during those years, she received special education services based on a specific learning disability. (Tr. 218-33, 425).   Thereafter, Plaintiff was home schooled (Tr. 232), attended classes at Life Skills Center of Ohio (Tr. 340-63), and received services from the Ohio Rehabilitation Services Commission ("ORSC"). Plaintiff worked part-time at a flower shop as part of vocational training, but this activity did not constitute past relevant work. (Tr. 203).

## II. SUMMARY OF THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2011.

2. The claimant has not engaged in substantial gainful activity since January 1, 1995, the alleged onset date.

3. The claimant has the following severe impairment: mild mental retardation.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is capable of performing simple one or two step instructions if she is given simple explanations and is not required to work quickly or meet strict production quotas, and is allowed to work at a flexible pace.  The claimant is able to understand, recall, and complete simple instructions.  She is

3

capable of interacting appropriately with others, but should not have extensive interaction with the public.  The claimant would be able to perform simple routine tasks in an environment that would be static—not given to frequent change in routine or setting or requirements; and would not require high production quotas or a fast pace.  The claimant would need to have verbal instructions.

6.  The claimant has no past relevant work.

7.  The claimant was born on August 5, 1988 and was 6 years old, which is defined as a younger individual age 18-49, on the alleged onset date.

8.  The claimant has a limited education and is able to communicate in English.

9.  Transferability of job skills is not an issue because the claimant does not have past relevant work.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 1995, through the date of this decision.

(Tr. 21-29) (internal citations omitted).

### III. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  *See* 20 C.F.R. §§ 404.1505, 416.905.

### IV.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial

evidence, and whether, in making that decision, the Commissioner employed the proper legal standards.  *See Cunningham v. Apfel*, 12 F. App'x 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed.  *Id.*  The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  However, it may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## V. ANALYSIS

### A.  Listing 12.05C

Plaintiff argues the ALJ erred in evaluating whether she met or medically equaled the requirements of Listing 12.05C, the listing for mental retardation.  She raises two issues:

    1.  Whether the ALJ erred in determining that Plaintiff does not have a valid IQ score falling between 60-70 as consistent with Listing 12.05C.

    2.  Whether Plaintiff suffers from a specific learning disorder which imposes additional and significant work-related limitations that meet the criteria for Listing 12.05C.

The undersigned finds that substantial evidence supports the ALJ's finding that Plaintiff did not meet Listing 12.05C.

The third step of the disability evaluation process asks the ALJ to compare the claimant's impairments with an enumerated list of medical conditions found in the Listing of Impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 416.920(a)(4)(iii), 404.1520(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). The Listing of Impairments recites a number of ailments which the Social Security Administration has deemed "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 416.925(a), 404.1525(a). Each listing describes "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 416.925(c)(3), 404.1525(c)(3).

A claimant will be deemed disabled if his impairments meet or equal one of these listings. In order to "meet" a listing, the claimant must satisfy all of the listing's requirements. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 653 (6th Cir. 2009). If the claimant does not meet all of the listing's requirements, he may still be deemed disabled if his impairments "medically equal" the listing in question. 20 C.F.R. §§ 416.926(b)(3), 404.1526(b)(3). To do so, the claimant must show that his impairments are "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 416.926(a), 404.1526(a).

Under Listing 12.05C, a claimant must establish that she: (1) experiences significantly sub average general intellectual functioning with deficits in adaptive functioning that initially manifested before the age of twenty-two; (2) has a verbal, performance, or full scale IQ of 60 through 70; and (3) suffers from a physical or other mental impairment imposing an additional and significant work-related limitation on function. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

Section 12.00D of the Appendix also provides that "where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." 20 C.F.R. Pr. 404, Subpt. P, App. 1 § 12.00D(6)(c). In other words, the regulation requires an ALJ to use the lowest valid score from a single test administration in determining whether any of those scores meet the numerical ranges of Listing 12.05.

### 1. Criteria 2: IQ testing

Plaintiff maintains that, contrary to the ALJ's conclusion, evidence in the record shows she met the second requirement of Listing 12.05C, an IQ test score between 60 and 70. Russell points to medical records from one-time consultative examiner, Ronald Smith, Ph.D., who administered the Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV) test in March 2010. (Tr. 375, 377). Dr. Smith opined that Russell obtained a full scale IQ score of 67. (*Id.*). According to Russell, it was error for the ALJ to reject this score on the grounds that she exhibited higher IQ scores on previous tests.

Plaintiff has multiple sets of IQ scores in her record prior to the age of twenty-two. Russell's first set of IQ scores comes from a WAIS third edition test administered on March 4, 2005. (Tr. 430). The scores showed a verbal IQ of 74, a performance IQ of 81, and a full scale IQ of 76. (*Id.*). This test was part of a school district evaluation team's review of Plaintiff's eligibility for special education services. (Tr. 435). It appears that Plaintiff's school psychologist, P. Levstik, administered the test. (Tr. 430, 437). An evaluation team report assessed Plaintiff's test results, noting that her full range IQ score placed in her the borderline range of intellectual functioning. (Tr. 435).

The record contains a second IQ test administered by Plaintiff's school psychologist, Harvey Effron, on September 8, 2005, when Plaintiff was seventeen years old.  (Tr. 413).  This test was the Wechsler Abbreviated Scale of Intelligence (WASI), and it showed that Plaintiff had a verbal IQ of 73, a performance IQ of 87, and a full scale IQ of 76. (*Id.*).  The WASI was described in an evaluation team report, which indicated that Plaintiff appeared frustrated and tired during the test, but the team found that her persistence indicated the exam gave an accurate measure of her true abilities. (Tr. 417). The report noted that Russell's scores on the IQ test were in the borderline range of intellectual functioning. (*Id.*).

In March 2009, Russell underwent the WAIS third edition test and received a verbal IQ of 82, a performance IQ of 92, and a full scale IQ of 86. (Tr. 257).  She was twenty years old at the time of the examination. (*Id.*).  The test administered by Ryan Manner, M.A., a school psychologist (Tr. 262), and was also part of a school evaluation team report to evaluate Russell for learning disabilities. (Tr. 258-65).  Mr. Manner observed that Russell was cooperative during testing and displayed no social or adaptive delays. (Tr. 258).  He also indicated that Russell's full scale score showed her in the low average range for students her age and fell in the eighteenth percentile. (*Id.*).  The evaluation report concluded that Plaintiff suffered from a specific learning disability, on the basis that her reading, writing, and math scores were significantly below her measured IQ of 86. (Tr. 265).

During March 2010, Dr. Smith conducted a consultative examination with Plaintiff and administered the WAIS-IV test, which showed Plaintiff's full scale IQ at 67, a verbal comprehension index of 68, and a perceptual reasoning index of 79, and a working memory index of 74. (Tr. 377-78). The doctor opined that the full scale score fell in the mildly mentally retarded range of intellectual ability. (Tr. 378).

Section 12.00D of the listings requires that an IQ score be valid. *Brown v. Sec. of Health and Human Servs.*, 948 F.2d 268, 269 (6th Cir. 1991). "The I.Q. score must reflect the claimant's true abilities as demonstrated by his or her performance at work, household management and social functioning." *Id.* (citing 20 C.F.R. § 404, Subpt. P, App. 1, § 12.00B-C). Furthermore, as the Sixth Circuit Court of Appeals has noted "[t]he regulations do not limit the question of validity to test results alone in isolation from other factors." *Id.*; *see also Henry v. Barnhart*, 156 F. App'x 171, 173 (11th Cir. 2005) (internal quotation omitted) ("[T]he ALJ is allowed some leeway to evaluate other evidence . . . when determining the validity of an I.Q. score"). When determining the validity of relevant IQ scores, the ALJ has latitude to consider a variety of evidence, including other IQ tests. *See Griffey v. Astrue*, No. 1:08-CV-786, 2009 WL 4396520, at *6 (S.D. Ohio Dec. 1, 2009) ("The wide discrepancy between two tests given ten years apart is further evidence of the questionable validity of the later tests."). An ALJ may reject IQ scores that are contrary to substantial evidence. *See Courter v. Comm'r Soc. Sec.*, 479 F. App'x 713, 721 (*citing Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007)).

Here, the ALJ took into account the multiple IQ tests that Plaintiff underwent in deciding that the result of Dr. Smith's examination was an underestimate of Plaintiff's abilities. In his opinion, the ALJ acknowledged that Dr. Smith's test showed a full scale IQ score of 67. (Tr. 22). Nonetheless, the ALJ found that Plaintiff did not meet the second criteria of Listing 12.05C, because her school records showed all of her previous IQ scores were above 70. (*Id.*). When discussing whether Plaintiff met the requirements of Listing 12.05, as well as during his analysis of Plaintiff's residual functional capacity ("RFC"), the ALJ described the results of Russell's IQ tests from September 2005, March 2005, and March 2009. (Tr. 22, 25). The ALJ accurately noted that none of the scores from IQ tests prior to Dr. Smith's fell into the range required by the

9

listing. (Tr. 22).  These higher scores contradicted the result of Dr. Smith's test and called it into question.

While it may have been preferable for the ALJ to provide a more in-depth discussion as to why he found Dr. Smith's score was invalid, his discussion of the disparity in test scores sufficiently draws into question the score's validity.  From 2005 to 2009, Plaintiff's IQ scores, as described by the ALJ, show a trend of remaining relatively stable or increasing.  The notable drop in Plaintiff's IQ as evidenced by Dr. Smith's test in 2010, therefore, is suspect.  Accordingly, substantial evidence supports the ALJ's decision to find Dr. Smith's test score invalid and conclude that Plaintiff did not meet the second criteria of the listing.

Plaintiff asserts that the ALJ erred by failing to sufficiently inquire into the validity of the IQ tests while conducting the listing analysis.  Russell notes that the ALJ did not acknowledge that the September 2005 IQ test was an "abbreviated" test, was administered and interpreted by an individual whose qualifications are not set forth, and was not stated to be valid by the administrator.  Regarding the March 2005 test, Plaintiff argues that the ALJ's decision states no qualifying facts about the test.  On the other hand, she maintains that Dr. Smith's 2010 IQ finding was performed by a qualified psychologist, was the most current of the IQ results, and could not be discounted by the ALJ in favor of older, unexplained school IQ scores.  In support of her argument, Russell cites the Social Security Administration's Program Operations Manual System ("POMS") Section DI 24515.055, which states that when evaluating test results: "It is obviously important to know what test was administered, the date the test was administered, the age of the subject at the time the test was given, whether the results are applicable to the subject's current condition, and the qualifications of the examiner."[2]

─────────────

[2] The POMS is the operational reference used by the Social Security Administration staff to conduct daily business. "While these administrative interpretations [POMS] are not products of formal rulemaking, they

While the Commissioner must certainly consider the validity of test scores, Plaintiff points to no authority demanding a heightened level articulation from the ALJ when analyzing the same.  The POMS section Russell identifies sets out factors that the ALJ may consider—it does not mandate a discussion of each of those factors.  Though the ALJ did not discuss in detail the administrative aspects of the test, it is well-established that the ALJ need not discuss each piece of evidence to show it was considered.  The ALJ considered the various IQ scores, and given the disparity of Dr. Smith's score from others in the record, the ALJ reasonably concluded that the score was not reliable.  Though the ALJ did not expressly acknowledge that the September 2005 IQ test was an abbreviated IQ test, making it of lesser import, *see* POMS Section DI 24515.055(A)(1), any error in this respect is at best harmless.  Plaintiff's school evaluation team report indicated the scores on the September 2005 IQ test gave an accurate measure of her abilities. (Tr. 417).  Plaintiff does not point to evidence that would suggest the results of this examination, or the other test results the ALJ based his decision on, were invalid.

The record supports the ALJ's reliance on Russell's IQ test results.  It shows that the three IQ tests relied upon were administered by specialized personnel at Plaintiff's educational institutions; were analyzed by school evaluation teams, who did not question the validity of the results; and the test records contained descriptions of the test, the date the test was administered, and Plaintiff's age on the date of testing.  The additional IQ tests demonstrated that Russell's IQ remained stable or increased over time, calling into question Dr. Smith's IQ test results.  Accordingly, the Court concludes that substantial evidence supports the ALJ's finding that Russell did not meet the second criteria of Listing 12.05C.

---

nevertheless warrant respect." *Washington Dep't of Soc. Servs. v. Keffeler*, 537 U.S. 371, 385, 123 S.Ct. 1017, 154 L.Ed.2d 972 (2003). The POMS is available at http://www.ssa.gov/regulations/index.htm.

### 2.  Criteria 3: additional impairment

Plaintiff further argues that she has been diagnosed with a specific learning disorder, an impairment which she believes qualifies as an "additional impairment" under 12.05C.  The Commissioner maintains that a specific learning disorder is not a separate impairment from mental retardation, but merely a symptom.

Even if a specific learning disorder may constitute a separate impairment under the listing, which the Court does not now decide, it does not appear that Plaintiff has shown how her alleged specific learning disorder imposes additional and significant work-related limitations separate from the effects of mental retardation. *See Shave v. commissioner of Soc. Sec.*, No. 1:12-CV-2692, 2013 WL 1453374, at *6 (N.D. Ohio April 9, 2013) (plaintiff failed to establish specific functional limitations from her additional impairments of ADHD and diabetes that would satisfy the requirement of Listing 12.05C.  Aside from arguing that her learning disorder may constitute a separate impairment, Plaintiff only seems to imply that the disorder limited her reading, writing, and math skills to a greater extent than her IQ would indicate she was capable.

Nonetheless, because Plaintiff has not proven how she satisfies the test score requirement of Listing 12.05C, whether the ALJ erred in determining that she does not meet this third criterion is irrelevant.  To be found disabled a claimant must show that all of the criteria for a listing have been met, and the claimant bears the burden to present evidence showing such. *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).  Because the ALJ correctly found Plaintiff did not meet second prong of the listing, the Court need not determine whether the ALJ erred in concluding that Plaintiff did not meet the additional impairment requirement.

In connection with this allegation of error, Plaintiff maintains that state agency reviewing consultant Katherine Lewis, Psy.D., supplied the diagnosis of Plaintiff's specific learning disability, which the ALJ failed to address in his opinion.  Given that the ALJ's listing conclusion is supported by substantial evidence due to his finding regarding the test score criteria, the undersigned need not address this issue.  Nonetheless, the Court notes that state agency reviewing consultant Dr. Lewis simply reviewed the evidence in Plaintiff's medical record, and as part of her review, she observed that Plaintiff "alleges a learning disability" and school records indicated a learning disability. (Tr. 395).  The state reviewing consultant did not diagnose or adopt a diagnosis of a specific learning disability.  The ALJ was not required to discuss each of Dr. Lewis's observations and the evidence Plaintiff points to regarding a learning disability diagnosis are only part of those notes.

### B.  Consultative Examiner Dr. Smith

Plaintiff contends that the ALJ failed to properly analyze the opinion of one-time consultative examiner Ronald Smith, Ph.D.  Dr. Smith examined Plaintiff on February 23, 2010. (Tr. 369-76).  The doctor recorded his observations from the examination and concluded his report with the following discussion of Russell's work-related abilities:

1. Plaintiff is not impaired in her ability to relate to others.
2. Her mental ability to understand, remember, and follow instructions will be significantly related to the manner in which the instructions are presented and the type of task which she is asked to perform.  That is, she will not be impaired in her ability to perform and remember a task if the task primarily involves visual motor skills and coordination, involves relatively simple construction operations, and she is shown how to perform the task. On the other hand, she will be markedly impaired in her ability to perform a task that requires her to read instructions, or involves a quota system or speed in performance.
3. Her mental ability to maintain attention, concentration, and persistence in the performance of routine tasks is not impaired.
4. Her mental ability to withstand stress and pressure of daily work is mildly impaired
5. She will be in need of assistance in handling funds if they are awarded.

13

(Tr. 376).  The ALJ attributed "some weight" to the doctor's opinion, but not full weight, because the evidence showed that Russell was more limited than Dr. Smith concluded in maintaining attention, concentration, and persistence when performing routine tasks.  (Tr. 27).

Plaintiff argues that the ALJ erred by failing to evaluate Dr. Smith's opinion that Plaintiff "could add four plus five correctly, counting on her fingers," and "will be in need of assistance in handling funds if they were to be awarded." (Tr. 370, 376).  Plaintiff's argument lacks merit.

It is well established that for a decision to stand, an ALJ is not required to discuss every piece of evidence in the record. *See Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004).  Nonetheless, if the opinion of a medical source contradicts the RFC finding, the ALJ must explain why he did not include its limitations in his determination of a claimant's RFC. *See, e.g., Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011).  Social Security Ruling 96-8p states: "The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." S.S.R. 96-8p, 1996 WL 374184, at *7 (July 2, 1996).

Here, the ALJ provided a detailed discussion of Dr. Smith's findings regarding Plaintiff's work-related mental abilities. (Tr. 26-27). The ALJ was not required to discuss every piece of evidence from Dr. Smith's nine page report as Plaintiff contends.  Furthermore, while Dr. Smith observed that Plaintiff had some difficulties with math during the examination (Tr. 370), the doctor ultimately did not assign a work-related limitation stemming from such problems. (Tr. 376).  Thus, the ALJ's RFC does not conflict with the doctor's findings, because the doctor did not find Plaintiff more limited than the ALJ's assigned RFC due to her struggles with math.  In regard to management of social security funds, Plaintiff fails to show how this finding would

14

result in a work-related limitation that the ALJ ought to have accounted for.  Accordingly, substantial evidence supports the ALJ's decision regarding Dr. Smith.

### C.  Other sources

Plaintiff contends that the ALJ failed to appropriately evaluate the opinions of various "other sources," who submitted evidence as to her ability to work.  These other sources were counselors from the Ohio Rehabilitation Services Commission ("ORSC"), a state agency that helps individuals with impairments obtain work, and Plaintiff's employer at Puffers Floral Shoppe, where Plaintiff worked part-time for a number of years.

Social Security Ruling (SSR) 06-03p explains how the Commissioner considers opinions from sources who are not "acceptable medical sources," but rather, are considered "other sources." SSR 06-03p, 2006 WL 2329939, at *1.  Among these other sources are counselors and employers. Id. at *1-2.  Information from other sources cannot establish the existence of a medically determinable impairment; however, the Commissioner should consider such information because it may be based on special knowledge of an individual and may provide insight into the severity of the individual's impairments and how they affect the individual's ability to function. Id.  Additionally, SSR 06-03p states:

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

2006 WL 2329939, at *6.  District courts in this circuit vary in their interpretation of whether SSR 06-03p requires an ALJ to discuss the reasons for not crediting opinions from other sources.

See, e.g., Brewer v. Astrue, No. 4:11-CV-00081, 2012 WL 262632, at *10 (N.D. Ohio Jan. 30, 2012) ("SSR 06-3p does not include an express requirement for a certain level of analysis that

must be included in the decision of the ALJ regarding the weight or credibility of opinion evidence from 'other sources.' ") (internal quotation marks and alterations omitted)); *Patterson v. Astrue*, No. 5:09-CV-1566, 2010 WL 2232309, at *14 (N.D. Ohio June 2, 2010) (remanding when, "in rejecting [treating chiropractor's] opinion, the ALJ did not provide any rationale beyond his conclusory statement that [the] opinion is inconsistent with the objective medical evidence and appears to be based solely on [plaintiff's] subjective performance" because "[t]his rationale deprives the Court of the ability to engage in any meaningful review regarding an issue that may impact the outcome of this case").

Nonetheless, even if the ALJ should have provided further explanation regarding the other sources at issue here, as Plaintiff purports, his failure to do so is at most harmless error in this case. As the Court has previously explained, "[t]here is no requirement to remand if there is no reason to believe that a different outcome could result had the 'other source's' opinions been assessed." *Carroll v. Astrue*, 1:09-CV-1232, 2010 WL 2643420, at *10 (N.D. Ohio July 1, 2010) (*citing Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004). The undersigned will address these other source opinions in turn.

### 1. Ohio Rehabilitation Services Commission

According to Plaintiff, the ALJ erred by failing to mention deficiencies identified by Devin Soper, a job counselor at ORSC, as well as, opinions from other ORSC employees.

Ms. Soper completed a form addressing Plaintiff's ability to work on April 30, 2007. (Tr. 310). The form was entitled "Documentation of Significantly Disabled/Most Significantly Disabled." (*Id.*). Ms. Soper indicated that Plaintiff was "most significantly disabled." (*Id.*). The form also contained a series of check boxes describing work-related skills. (*Id.*). Ms. Soper

16

checked boxes representing that Plaintiff was seriously limited in her interpersonal skills, self-direction, work tolerance, reading, writing, and comprehension. (*Id.*).

The ALJ specifically discussed Ms. Soper's April 2007 evaluation and attributed little weight to the opinions expressed there in. (Tr. 26).  The ALJ did so, in part, because Ms. Soper opined as to the ultimate determination of disability. (*Id.*).  It is correct that an opinion indicating a claimant is disabled is not entitled to special significance because the final responsibility of determining disability is reserved to the Commissioner. *See* 20 C.F.R. 404.1527(d).  Further, the ALJ noted that Ms. Soper applied different standards than those applied by the Commissioner in evaluating whether Russell was disabled. (Tr. 26).

The ALJ did not discuss each of the deficiencies that Ms. Soper marked on the form in support of her conclusion that Plaintiff was significantly disabled.  The ALJ's decision not to detail his reasons for crediting or rejecting each of checkbox limitations on the form does not require remand, because a different outcome would not have resulted had Ms. Soper's opinion been further assessed.  The majority of the limitations suggested by Ms. Soper were accounted for in the RFC.  In terms of interpersonal skills, the ALJ limited Plaintiff to jobs without extensive interaction with the public; as to Plaintiff's problems with reading, the ALJ determined that Plaintiff could only perform tasks when given verbal instructions. (Tr. 24).  Plaintiff does not show how the ALJ failed to account for any of the checkbox limitations in the RFC.

Russell asserts that the specific limitations Ms. Soper identified were based on her evaluation of Plaintiff's part-time floral shop work.  However, it appears that Ms. Soper did not base her limitations strictly on Russell's work performance, but instead, the counselor speculated as to many of the limitations and based them on factors other than Russell's mental impairments. For example, Ms. Soper indicated that Plaintiff was seriously limited in interpersonal skills, self-

direction, and work tolerance, but went on to clarify:  "It is *possible* [Russell] may have difficulties with self-direction because she is a transition student with close to no work experience—she *may* also find frustrations on the job and difficulty getting along with others." (Tr. 310) (emphasis added).  These deficiencies in Ms. Soper's report support the ALJ's discounting the conclusions contained therein.

It appears that the additional opinion evidence in the record from ORSC that Plaintiff refers to is limited to reports from Louise Petrov.  Ms. Petrov was an employment specialist at ORSC, who collaborated with Ms. Soper to oversee Russell's part-time flower shop employment.  On August 22, 2007, Ms. Petrov provided an overview of Plaintiff's work performance. (Tr. 297).  Ms. Petrov indicated that Plaintiff's job coach created a "cheat chart" for her to use to identify the flowers sold at the shop and corresponding codes for the computer orders. (*Id.*).  She also stated that Plaintiff struggled with math and making change for customers. Ms. Petrov concluded that math was an area that Plaintiff should focus on in her studies at Life Skills Center. (*Id.*).  On November 20, 2007, Ms. Petrov recorded comments from Plaintiff's employer, which indicated her employer was concerned with her mathematical skills, and that Plaintiff had difficulty adding and determining what half a dozen was. (Tr. 288).

The ALJ did not directly address Ms. Petrov's notes from August and November 2007, which Plaintiff points to in her brief.  Nonetheless, the ALJ considered opinion evidence from ORSC, including additional records that documented Plaintiff's termination from the program because of non-compliance with attendance and completing a psychological evaluation. (Tr. 25-26).  Significantly, the majority of Ms. Petrov's notes consisted of observations from Plaintiff's employer, whose opinion the ALJ expressly accounted for. (Tr. 24-25).  Moreover, Plaintiff fails to explain how Ms. Petrov's notes might have changed the outcome of the ALJ's decision.  Ms.

18

Petrov focused on Plaintiff's struggles with interpersonal skills and math.  The ALJ limited Plaintiff to jobs that do not require extensive interaction with the public.  The RFC also restricted Plaintiff to jobs involving one- or two-step instructions, without strict production quotas, involving simple routine tasks, and only verbal instructions.  Other than asserting the conclusion that the RFC was insufficient to account for Ms. Petrov's observations, Plaintiff does not explain how the non-exertional restrictions fail to address her problems with math or any other purported limitation she believes additional opinions from ORSC warrant.  Absent further explanation, this argument fails.

### 2.  Plaintiff's employer

Plaintiff also contends that the ALJ failed to properly evaluate the opinion of her employer, Yvonne Hutchson.  Plaintiff worked part-time at flower shop, presumably under Ms. Hutchson's supervision, for approximately three years. (Tr. 365).  In a May 16, 2011 letter, Ms. Hutchson indicated that Plaintiff displayed difficulty in completing everyday work tasks, and had to be reminded of the names of flowers and the manner in which to complete certain tasks, despite the fact that she had worked on the same tasks over the course of her employment. (*Id.*).  Plaintiff maintains that although the ALJ discussed Ms. Hutchson's findings, his failure to analyze those findings requires remand.

When formulating the RFC, the ALJ provided a detailed overview of Ms. Hutchson's observations of Plaintiff as expressed in a May 2011 letter. (Tr. 24-25).  The ALJ explained that

> Yvonne L. Hutchson, President of Puffers Floral Shoppe, the claimant's employer, reported that the claimant displays difficulty in completing everyday work tasks.  She noted that the claimant has difficulty with adding, subtracting, and using the cash register.  Ms. Hutchson also reported that the claimant has a difficult time retaining information and must be provided reminders, even though she has been performing the same tasks for over three years.  Finally, Ms. Hutchson stated that the claimant cannot be left alone in the store.

19

(*Id.*).  Thus, the ALJ considered Ms. Hutchson's observations of Plaintiff in a work setting. While the ALJ did not state the weight attributed to Ms. Hutchson's opinions, any failure to do so was harmless.  Later in his opinion, the ALJ provided some insight as to why he did not find Plaintiff was disabled on the basis of her employer's comments.  The ALJ explained that Plaintiff did not work at the flower shop on a full-time basis because the work required was above that of her residual functional capacity. (Tr. 27).  Accordingly, the ALJ accounted for the opinions of Plaintiff's employer, but recognized those opinions were based on an evaluation of Plaintiff performing some tasks that required a higher level of skills than she possessed.

Moreover, Plaintiff does not argue how the RFC failed to account for her employer's observations.  As previously discussed, the RFC limited Plaintiff to simple routine work at a flexible pace, with verbal instructions.  As a result, Russell's allegation of error is not well-taken.

**D.  Hypothetical question to the VE involving hourly reminders**

Russell argues that the ALJ erred in failing to explain why he did not include in the RFC a restriction that she required hourly reminders at work.  During the administrative hearing, the ALJ asked the VE whether a requirement for hourly reminders would affect the three jobs the VE had already identified Plaintiff could perform under the controlling hypothetical question. (Tr. 67-68).  Essentially, the ALJ added an additional hourly reminder limitation to his controlling hypothetical question and asked the VE how it would impact the jobs available to Russell.  According to Plaintiff, because the ALJ found the limitation significant enough to inquire about it during the administrative hearing, he was required to explain why he did not include the limitation in the RFC.

This argument lacks merit.  It is true that an ALJ must explain his assessment of certain types of information, such as the opinion of a claimant's treating physician.  However, Russell

points to no legal authority—nor is the Court aware of any—requiring an ALJ to explain his decision to reject limitations he raised to the VE, but are not included in the controlling hypothetical question.    An ALJ is generally permitted to question the VE during the administrative hearing, and is not obligated to explain why limitations included as part of that questioning are not adopted.   Plaintiff points to authorities which she reasons lead to the conclusion that the ALJ ought to articulate in his decision to reject limitations raised at the hearing, but none of these sources actually *require* the ALJ to proceed in such a manner.   Absent such authority, there is no basis for concluding that the ALJ erred in failing to explain why he rejected the hourly reminder limitation, even though he questioned the VE about the limitation. The ALJ asked the VE whether Plaintiff would be capable of performing jobs with the exact limitations set forth in her RFC. (Tr. 66-67).   The VE identified three such jobs.  (*Id.*).  The ALJ was not required to explain why he did not adopt other limitations set out in additional questions.

In her Reply Brief, Plaintiff adds that her employer and Dr. Lewis supported her need for hourly reminders.   Plaintiff's employer observed that Plaintiff sometimes needed reminders while at work, but did not indicate how often the reminders were necessary or for what types of tasks. (Tr. 365).   Dr. Lewis acknowledged that some evidence indicated Plaintiff "needs reminders to do things from time to time." (Tr. 395).  Nonetheless, Dr. Lewis did not include any type of reminder requirement in her recommended RFC. (*Id.*).  The ALJ attributed great weight to Dr. Lewis' opinion, which found that Plaintiff could perform work without the need for reminders. (Tr. 26).  This evidence does not establish that Plaintiff required hourly reminders, and as such, did not require the ALJ to further articulate his reasoning in this regard.

### E.  Reasoning level of the jobs identified by the VE

Plaintiff argues that the VE's testimony does not support the ALJ's finding at step five of the sequential evaluation because it was inconsistent with the Dictionary of Occupational Titles ("DOT").  The VE testified that Plaintiff would be capable of performing work as a cook/helper (DOT 317.687-010), laundry worker II (DOT 361.685-018), and dining room attendant (DOT 311.677-018). (Tr. 28, 66-67).  Plaintiff posits that the reasoning level requirement of these jobs is inconsistent with her ability to perform jobs that involve only one- and two-step instructions as set forth in the RFC.

The DOT assigns each job a General Educational Development ("GED") score, which "embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance." Dep't of Labor, Dictionary of Occupational Titles, App'x C (III), 1991 WL 688702 (G.P.O.) (4th ed., rev'd 1991).  The GED scale is composed of three divisions of skill related development: reasoning development, mathematical development, and language development. Id.  "Reasoning development" is broken down into a number of levels. Reasoning Development Level 1 is defined as the ability to: "Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job." Id.  Reasoning Development Level 2 is described as the ability to: "Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations." Id.

Plaintiff's RFC limits her to jobs that involve performing simple one- or two-step instructions and simple routine tasks.  The three jobs that the VE found Plaintiff capable of, given her RFC, are listed in the DOT at reasoning Level 2, which Plaintiff asserts goes beyond

22

simple one- or two-step instructions of reasoning Level 1. As a result, she argues that the VE's testimony conflicts with the DOT and demonstrates that the ALJ's decision at step five of the sequential evaluation process is not supported by substantial evidence.

Plaintiff's argument is not well taken. Some courts have indicated that a limitation to simple one- or two-step instructions conflicts with jobs categorized as requiring Level 2 reasoning. *See, e.g., Rodriguez v. Comm'r of Soc. Sec.*, 3:11-CV-398, 2012 WL 380275 (N.D. Ohio Feb. 6, 2012). Others have found that Level 2 reasoning is consistent with the ability to perform one- or two-step tasks or simple routine tasks. *See, e.g., Cooper v. Comm'r of Soc. Sec.*, 3:07-CV-300, 2008 WL 4405045, at *10 (S.D. Ohio Sept. 24, 2008) ("Plaintiff's limitation to low stress work with no production quotas, simple one- or two-step tasks requiring little, if any, concentration, and no complex or detailed instructions is not inconsistent with the ability to perform jobs with a reasoning Level 2"); *Flaherty v. Halter*, 182 F. Supp. 2d 824, 850-51 (D. Minn. 2001) (concluding Level 2 reasoning did not conflict with limitation to work involving simple, routine, repetitive, concrete, and tangible tasks). The Sixth Circuit has yet to address this question.

Like the court in *Cooper v. Commissioner*, the undersigned also finds the reasoning of

*Meissl v. Barnhart*, 403 F. Supp. 2d 981, 983-85 (C.D. Cal. 2005) persuasive on this issue:

> This leaves the question of whether the vocational expert's opinion contradicted the DOT's descriptions for Meissl's other work as a stuffer given the ALJ's RFC finding limiting Meissl to "simple, repetitive" tasks. The Court finds that it does not.
>
> As one goes up the numerical reasoning development scale used by the DOT, the level of detail involved in performing the job increases while the job task becomes less routine. For example, a job with a reasoning level of one only requires that the worker be able to "[a]pply commonsense understanding to carry out simple one-or two-step instructions" in "standardized situations with occasional or no variables." DOT at 1011. In contrast, a job with a reasoning level of three would require that the worker "[a]pply commonsense understanding to

23

carry out instructions furnished in written, oral, or diagrammatic form" and deal "with problems involving several concrete variables . . . ." DOT at 1011. The middle ground between these two points is also where the vocational expert identified a job with the lowest reasoning development score that Meissl could perform, namely a stuffer.

A job with a reasoning level of two requires that the worker "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and deal with problems "involving a few concrete variables . . . ." DOT at 1011. Thus, such a job would involve more detail, as well as a few more variables, than that with a reasoning level of one. The question becomes whether a person limited to carrying out simple, repetitive instructions could still perform a job with such a reasoning score.

Meissl focuses on the fact that the DOT description for a reasoning level of 2 uses the word "detailed." Essentially, Meissl seeks to equate the DOT's use of the word "detailed" with the Social Security regulations' use of the word "detailed instructions" in formulating a claimant's mental RFC. The Court is not convinced that such a neat, one-to-one parallel exists between the two.

The Social Security regulations separate a claimant's ability to understand and remember things and to concentrate into just two categories: "short and simple instructions" and "detailed" or "complex" instructions. 20 C.F.R. § 416.969a(c)(1)(iii); *see also* 20 C.F.R. part 404, subpart P, Appendix 1, Listing 12.00C(3)("You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks"). The DOT, on the other hand, employs a much more graduated, measured and finely tuned scale starting from the most mundane ("simple one- or two-step instructions" at level one), moving up to the most complex ("applying principles of logical or scientific thinking . . . apprehend the most abstruse classes of concepts" at level six). DOT at 1010-1011. To equate the Social Security regulations use of the term "simple" with its use in the DOT would necessarily mean that all jobs with a reasoning level of two or higher are encapsulated within the regulations' use of the word "detail." Such a "blunderbuss" approach is not in keeping with the finely calibrated nature in which the DOT measures a job's simplicity.

Even more problematic for Meissl's position is that she ignores the qualifier the DOT places on the term "detailed" as also being "uninvolved." This qualifier certainly calls into question any attempt to equate the Social Security regulations' use of the term "detailed" with the DOT's use of that term in the reasoning levels. Instead of simply seeking to equate the two scales based on the serendipity that they happen to employ the same word choice, a much more careful analysis is required in comparing the claimant's RFC with the DOT's reasoning scale.

Here, the ALJ found that Meissl could perform not just simple tasks but also ones that had some element of repetitiveness to them. A reasoning level of one on the

24

DOT scale requires slightly less than this level of reasoning. While reasoning level two notes the worker must be able to follow "detailed" instructions, it also (as previously noted) downplayed the rigorousness of those instructions by labeling them as being "uninvolved."

The Court finds that there is much to recommend for believing that Meissl's reasoning level is at level two rather than at level one. A reasoning level of one indicates, both by the fact that it is the lowest rung on the development scale as well as the fairly limited reasoning required to do the job, as applying to the most elementary of occupations; only the slightest bit of rote reasoning being required. For example, the DOT describes the following jobs as requiring only a reasoning level of one: Counting cows as they come off a truck (job title Checker (motor trans.)); pasting labels on filled whiskey bottles (job title Bottling–Line Attendant (beverage)); and tapping the lid of cans with a stick (job title Vacuum Tester, Cans). *See* DOT at 931, 936, 938. Someone able to perform simple, repetitive instructions indicates a level of reasoning sophistication above those listed. Other courts have so held. *See Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005) (holding that "level-two reasoning appears more consistent with Plaintiff's RFC" to "simple and routine work tasks"); *Money v. Barnhart*, 91 Fed. App'x 210, 214, 2004 WL 362291, at *3 (3rd Cir. 2004) ("Working at reasoning level 2 would not contradict the mandate that her work be simple, routine and repetitive"). As one court explained:

> The ALJ's limitation for the Plaintiff, with respect to an appropriate reasoning level, was that she could perform work which involved simple, routine, repetitive, concrete, tangible tasks. Therefore, the DOT's level two reasoning requirement did not conflict with the ALJ's prescribed limitation. Although the DOT definition does state that the job requires the understanding to carry out detailed instructions, it specifically caveats that the instructions would be uninvolved—that is, not a high level of reasoning. *Flaherty v. Halter*, 182 F. Supp. 2d 824, 850 (D. Minn. 2001).

In the present case, the ALJ found Plaintiff could perform simple one- and two-step instructions, but also concluded that Plaintiff is able to perform simple routine tasks. (Tr. 24).  As a result, the undersigned finds that Plaintiff's limitation to simple one- or two-step instructions, simple routine tasks, without quota productions, with a flexible pace, and a static environment is not inconsistent with the ability to perform jobs with reasoning Level 2.  Thus, the Commissioner did not error by relying on the VE's testimony.

**F.  The VE's testimony regarding limitations on pace**

Plaintiff asserts further error with the ALJ's step five finding.  She notes that the controlling hypothetical question and RFC limited her to work that was not fast paced.  According to Plaintiff, the VE accounted for only fast paced production work, not work outside of a production setting that may require a fast pace.   Russell maintains that based on the VE's testimony, it is unclear whether the occupations named by the VE do not require fast paced work.

In his hypothetical question and the corresponding RFC, the ALJ limited Plaintiff to jobs that would not require her to work quickly, meet strict or high production quotas, allow her to work at a flexible pace, and would not require a fast pace. (Tr. 65).   After the ALJ posited a hypothetical question to the VE including such limitations, the VE indicated:

> I interpret production quotas—at least the way I will interpret it is like in a production setting. . . . Recognizing that all jobs expect a certain amount of work to be accomplished within a time period.

(Tr. 65).  Later in the administrative hearing the VE again clarified:

> I interpreted no fast pace or strict production quotas in a production setting and I eliminated those jobs and that was the reason I stipulated to that.  Every job has an expectation that there will be a certain amount of work performed within a given period of time.

(Tr. 80). Based on this testimony, it appears that the VE interpreted the requirement of production quotas in a production setting.  However, the VE acknowledged that all jobs require at least a minimal level of production from employees.  This statement signaled that the VE considered pace when evaluating all jobs, not just those in a production setting.  While the ALJ included limitations specifically precluding a "fast pace" and "strict or high" production quotas, the ALJ's RFC did not provide that Russell could not work at any pace or meet even minimal production requirements.  Accordingly, the VE's testimony accounted for the pace limitations

imposed by the ALJ in his controlling hypothetical question and serves as substantial evidence in support of the finding at step five.

## VI. DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence.  Accordingly, the undersigned AFFIRMS the decision of the Commissioner.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date:  March 31, 2014.